**IN THE UNITED STATES COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARIA MENAS, Administrator of the Estate of Dimitrios Emmanuel Menas, Deceased, and in her own right, | ) | CIVIL DIVISION |
| | ) | Civil Action No: 2:23-cv-353 |
| Plaintiff, | ) | |
| | ) | US Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| WASHINGTON TOWNSHIP; JARRED KIER; AND JAKE SKUNDA, | ) | **ELECTRONICALLY FILED** |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## **DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS**

### **TIMELINE ON RELEVANT EVENTS**

1. The following events are recorded by Westmoreland county 9-1-1. *See* Exhibit "B", p. 71.

2. At 12:56 a.m., Unit 5530 (Officer Kier) conducted a traffic stop on Route 66 near the intersection of Paradise Drive in Washington Township. *See* Exhibit "B", pp. 71-72. *See also* Exhibit "N".

3. At 1:04 a.m. Unit 5537 (Officer Skunda) called out at the scene of the traffic stop. *See* Exhibit "B", p. 72 and Exhibit "N".

4. At 1:15 a.m. Officer Kier requested that EMS respond to the Washington Township Police Station for a blood draw. *See* Exhibit "B", p. 71 and Exhibit "N".

5. At 1:17 a.m. Officer Kier transported a person in custody to the Washington Township Police Station. *See* Exhibit "B", pp. 71-73 and Exhibit "N".

6. At 1:28 a.m., Officer Kier and his arrestee arrived at the Police Station. *See* Exhibit "B", p. 73 and Exhibit "N".

7. At 1:35 a.m., Officer Skunda cleared the traffic stop after the suspect vehicle had been towed. *See* Exhibit "B", p. 73 and Exhibit "N".

8. At 2:08 a.m. Office Kier left the Police Station to transport the arrestee to 521 Beech Street in Plum Borough. *See* Exhibit "B", pp. 73-74 and Exhibit "N".

9. At 2:40 a.m. Officer Kier arrived at 511 Beech Street in Plum. *See* Exhibit "B", p. 74 and Exhibit "N".

10. On July 5, 2021 at 3:32 a.m. Plum Borough police officers were dispatched to 521 Beech Road for a report of a possible burglary in progress. *See* Exhibit "P", p. 2 and Exhibit "D", p. 12.

11. Responding officers determined on arrival that a suicide had occurred. *See* Exhibit "P:, p. 2 and Exhibit "D", p. 7.

**POLICE OFFICER TRAINING AND DEPARTMENT POLICIES**

12. Jarred Kier and Jake Skunda were at all relevant times police officers for the Washington Township Police Department. *See* Exhibit "L", Responses to Interrogatories Nos. 1 and 2.

13. Officer Kier has been police officer for various police departments since June 2011. *See* Exhibit "E", Response to Interrogatory No. 15.

14. Officer Kier graduated from the Allegheny County Police Training Academy receiving Certification No. MPS0007 that he attended from July 7, 2010 through December 8, 2010. *See* Exhibit "F".

15. As part of his Police Academy training, Officer Kier was trained in human relations and crisis management and successfully passed testing that included knowledge of behavioral management/crisis intervention, dispute intervention/conflict management; suicide and related topics. S*ee* Exhibit "F", p. 2.

16. Officer Kier received additional training in DUI enforcement and crisis intervention. *See generally* Exhibit "G".

17. Officer Skunda has been a police officer since 2014. *See* Exhibit "H", Response to Interrogatory No. 15.

18. Officer Skunda is also a graduate of the Allegheny County Police Training Academy and would have received the same training as Officer Kier. *See* Exhibit "B", pp. 7-8.

19. Officer Skunda has received a significant amount of additional training beyond the yearly updates required by the Municipal Police Officer Education and Training Commission as evidenced by the certificates collectively at Exhibit "I".

20. Subsequent to the events that form the basis of the within litigation, Officer Skunda completed a course in "Interacting with the Mentally Ill as a First Responder". *See* attached hereto a copy of the Certificate and course materials at Exhibit "J".

21. The Washington Township Police Department has had in place policies directing officers with regard to making arrests, searching individuals, special transportation situations and transporting prisoners to medical facilities. *See* attached hereto generally Exhibit "K".

22. Prior to the events of July 5, 2021, the Washington Township Police Department had never experienced a suicide while an individual was in the custody of a Washington Township police officer or after a Washington Township police officer released an individual from custody.

## DECEDENT'S MEDICAL HISTORY

23. Plaintiff had no known psychiatric medical history as represented by his mother; "Plaintiff is unaware of any psychiatric treatment received by decedent [Dimitrios Menas]. *See* Exhibit M", at Response to Interrogatory No. 3.

24. Plaintiff, Maria Menas, did not know either Defendant, Jake Skunda or Jarred Kier, nor did she know any other Washington Township police officers. *See* Exhibit "C", pp. 52-53.

25. "And just to confirm, … he [Dimitrios Menas] never had problems with depression or any psychiatric problems to your knowledge; is that correct?

A. No. That is correct. No, he did not."

*See* Exhibit "C", ¶¶36-37.

26. Dimitrios Menas was not known to the officers prior to the traffic stop on July 5, 2021. *See* Exhibit "B", pp. 43-44.

## TRAFFIC STOP

27. On July 5, 2021 at 12:56 a.m., Officer Kier was on patrol in a marked Washington Township Police car on Route 66 when he observed a black Mercedes-Benz swerving "all over the road and crossed over the center road line and fog lines." *See* Exhibit "O", p. 4, Exhibit "N" and Exhibit "A", pp. 42-43.

28. Officer Kier requested that the driver, later identified as Dimitrios Menas, exit the vehicle and perform field sobriety tests. *See* Exhibit "O", p. 4 wherein the Officer reported:

> This Officer made contact with the driver while speaking with the driver. This Officer could smell a strong odor of an intoxicating beverage and his speech was slurred. I observed that he had watery eyes. He had difficulty finding the vehicle documents that I requested. Defendant was wearing a handkerchief over his mouth. I asked the Defendant to exit the vehicle to perform field sobriety tasks and observed that he was unsteady on his feet and had no shoes on. … he was patted down for weapons.

*See* Exhibit “O”, p. 4. See also Exhibit “A”, p. 54.

29. Officer Kier determined that Dimitrios Menas was impaired and placed him under arrest and transported him to the police station.

Q. You transported him from Route 66 to the Police Station; is that correct?

A. Yes, sir.

Q. About how far is that, time wise, at that time of night?

A. Maybe 10 minutes.

Q. Was he handcuffed?

A. Yes.

Q. Alright. And he was placed in the back?

A. Yes. He was placed under arrest, handcuffed and placed in the rear of my car.

*See* Exhibit “A”, pp. 53-54.

30. Officer Kier responded as backup. *See* Exhibit “N”, Exhibit “O:, p. 5 and Exhibit “B”, pp. 24-25.

31. After Officer Kier left the scene the traffic stop with Dimitrios Menas in custody, Officer Kier stood by and waiting for the tow truck to arrive. *See* Exhibit “O”, p. 5.

32. Prior to leaving, Officer Skunda search the vehicle for personal belongings prior to Mr. Menas’ vehicle being towed and provided him with his wallet, his house keys except for the ignition key to the Mercedes and shoes. *See* Exhibit “B”, p. 25.

33. Specific to the keys, Officer Skunda testified:

Q. So you would have removed the keys from his car?

A. I believe so.

Q. You kept the key for the car that he was driving with car; is that correct?

A. Yes.

Q. And then give him the rest of the keys?

A. Yeah. Any keys that were on that ignition key we would give him the rest of the keys back.

…

A. I mean, there's – it's -- the keys are his property. So, I mean, its -- I had no reason to ask him what keys he had.

*See* Exhibit "B", pp. 25-26.

34. After the tow truck left with the vehicle Officer Skunda drove to the Police Station. "Whenever it was hooked up and it started to leave – the tow truck started to leave with the vehicle, that's when I left. I waited until it was completely secure on the vehicle to be towed away." *See* Exhibit "B", p. 29.

35. On arrival at the Police Station, Officer Kier and Mr. Menas were met by EMS representatives from Murrysville Medic One.

Q. Is their primary purpose for being there to draw the blood?

A. Yes.

Q. Did you -- and that was done, I assume; is that correct?

A. Yes, sir.

*See* Exhibit "A", pp. 58-59. *See also* Exhibit "O", p. 4 ("he agreed to do the test and Murrysville EMS took two samples of blood and it was placed in a sealed blood kit").

**SUICIDAL THREATS**

36. Prior to the traffic stop, Dimitrios Menas advised the officers that he had been at a party in Saltsburg and a male forced him to leave the party and threatened him harm if he did not do so. *See* Exhibit "O", p. 5:

> They forced him to drink then made threats to him and forced him to leave and took his gun, shoes and phone.
>
> Menas advised Officer Kier that he believed he had .22 cal handgun on his person. Officer Kier advised him that he thoroughly searched him and did not find a handgun. Menas then stated that they must have taken it. Menas states that he was at a party in Saltsburg, and a male forced him to leave the house. Menas went on to state the male told Menas if he did not leave, he was going to harm him.

37. During the course of the traffic stop including the field sobriety tests, Menas did not make any comments that he intended to harm himself.

> Q. During the course of the field sobriety that you did on the road, did he make any comments to you -- Dimitrios -- did he make any comments to you at that time of wanting to harm himself.
>
> A. During the arrest? No. With the SFST [Standard Field Sobriety Tests] no.

*See* Exhibit "A", p. 54.

38. Officer Kier transported Plaintiff from the scene of the traffic stop to the Police Station and described it as follows:

> Q. Did he make any statements at that point that you can recall about wanting to harm himself or wanting to kill himself?
>
> A. I didn't hear any statements made in the back of the car, because it was hard to hear anything he was saying in the back of the car, because we have a cage; and it is, like, a Plexiglas kind of -- it is maybe a half-inch thick. It is hard to hear anything he is saying back there without me actually focusing and asking him to repeat himself before I hear anything. But he was crying, hysterical the whole way back, you know.
>
> Q. And when you say "the whole way back", do you mean back to the Police Station?
>
> A. Yes, sir. And for me to even hear anything he was saying I would have to ask him multiple times what he said. You know, it is hard to hear. Now, on the video, there is a mic inside the cage, so you can hear everything that they are saying inside there; but outside of the cage, I have the radio

on, I am driving, and I didn't hear him say any suicidal remarks in the cage, or inside the vehicle transporting him home -- or, I mean, to the station.

Q. To the station?

A. To the station, yeah. Sorry.

*See* Exhibit "A", pp. 55-56.

39. Officer Kier affirmed that while traveling from the scene of the traffic stop to the Police Station that Dimitrios Menas was crying.

Q. Ok. And you said that he was being hysterical. What do you mean by that?

A. He was acting intoxicated. You know, he seemed like he was upset. Basically, he was arrested and he was mad about his car being towed.

Q. Was he upset about being arrested?

A. He was upset about being arrested and about this party, apparently, so …"

*See* Exhibit "A", p. 56.

40. On arrival at the Police Station the EMS personnel were waiting and the blood draw took place.

Q. When you were there, he was not placed -- Dimitrios was not placed in a holding cell, was he?

A. No, because when we got there, I believe the EMS was already there. So we were only there to draw blood.

…

Q. Is their primary purpose for being there to draw blood?

A. Yes.

Q. Did you - - and that was done, I assume; is that correct?

A. Yes, sir.

*See* Exhibit "A", pp. 57-59. *See also* Exhibit "O", p. 4.

**DECEDENT'S COMMENT**

41. Before leaving the Police Station, Officer Kier telephoned Maria Menas. *See* Exhibit "A", p. 79.

42. The conversation according to Officer Kier's recollection was as follows:

> Q. What did you tell her when you called her?
>
> A. I can't recall what I told her; but I believe it was that her son was intoxicated and he was arrested for DUI; and then I think I talked a little bit about the party. I am just going by what I think I said. I can't be 100 percent totally sure, because it was so long ago. And that was when I asked her to come pick up her son, and she said she could not drive to the station; and that is when I kind of -- I told her I would do a courtesy and drive him home.
>
> Q. So she definitely told you she could not drive to the station?
>
> A. Yes.
>
> Q. Did you tell her at that time, at least in part that the interaction that you were having with Dimitrios, that he was acting hysterically?
>
> A. I can't recall.
>
> Q. Did you tell her anything about him crying?
>
> A. I can't recall.
>
> Q. Did you tell her when you were on the phone that he had made any kind of threats to harm himself?
>
> A. He didn't make any threats at that time, so I don't think so.

*See* Exhibit "A", p. 79-80.

43. Maria Menas' recollection of the telephone conversation with Officer Kier was more detailed as follows:

A. … when Officer Kier called me, I heard him in the background, but I never talked to him. He was never on the phone.

Q. So what did you -- I mean, how did you know it was your son in the background?

A. I know his voice.

Q. Could you hear what he was saying?

A. I did, I mean, I heard "my mother was born in Greece" and things like that. Like I was born in Greece, I guess he was talking to Officer Kier, but I could hear him in the background. And Officer Kier told me -- I said to him "that is my son. My son is in the background. I can hear him." He said, "you can hear him?" I said "yes, I can hear him." He said, "do you understand him?" I said, "yeah, I understand him" and he said, "well, I have a hard time understanding him. He is mumbling, like I can't really understand him."

Q. That was Officer Kier that said that to you?

A. Yeah. He was on the phone with me. And then he said to me that Officer Kier took over and he said, "well, he said you were born Greece." I said, "it's true." He said, "he said you have a hard time walking." I said, "yeah, he is telling you the truth." He said, "he helps you take care of your brother, which is his uncle, because he was in an accident and he helps you too because you need him." I said, "that is true. Everything he is telling you is true." He said, "and he said he is the first generation." I said, "yeah, that is true, too."

Q. What else did he say?

A. He said, but -- repeatedly he said "he said you have a hard time walking and you have health issues and all of that." I said "that is true. I do, and he does help me. And he helps me with my brother." He said, "OK." So that is when he told me -- he said -- he told me where was and what he did, that is how I knew where he was."

*See* Exhibit "C", pp. 55-57.

44. Officer Kier decided to transport Dimitrios Menas from the Police Station to his residence. *See* Exhibit "A", pp. 79-80. *See also* Exhibit "O", p. 4 ("the Defendant had no phone to call for a ride. This officer made contact with his mother on the phone and a courtesy transport was given to his residence. He was released to his mother and this officer cleared.")

45. After the blood draw was completed EMS personnel offered to transport Mr. Menas to the hospital as it was typical for these situations.

> Q, At any point while you were at the Police Station and the EMS personnel were there, did they offer to transport him to the hospital?
>
> A. Yes, he was offered a transport. After they give blood, there is a form that they fill out and they do ask if he wants to go to the hospital; and he refused and signed off on their form.

*See* Exhibit "A", p. 63.

46. As the officers were in the process of escorting Dimitrios Menas to the Police car he mumbled a threat:

> Q. Did Dimitrios make statements about harming himself when he was at the Police Station?
>
> A. After he gave blood, we were resting -- you know, cuffing him back in handcuffs to put him back in the patrol car, and he mumbled -- but it sounded like a statement -- that he wished he was dead, or something like that because he was still a little emotional. He was calm for the most part; but it was hard to hear anything he was saying, so
>
> …
>
> Q. So you are saying when you are putting him in the police car is when he made the statement.
>
> A. It was when we were putting him in cuffs to put him in the Police car, so it was in the station still.

*See* Exhibit "A", p. 61.

47. Officer Skunda was present and also heard the remark.

Q. So you've indicated in your report that Menas did mumble -- let me put this in quotes. "Menas did mumble, made a remark about being dead."

A. Correct.

Q. Alright. So was it clear to you that he was making a remark about being dead?

A. It was hard to hear because he was mumbling but it was something about him saying about wishing to be dead.

*See* Exhibit "B", p. 47.

48. The officers then asked Dimitrios Menas about the statement that he made.

> And then after we got him -- after we heard them remark that he is -- you know, after he said, you know, that he sounded like he wished he was dead, me and Officer Skunda, when I put him in the back of my patrol car, we both asked him multiple time if he was feeling suicidal or if he wanted to harm himself or anybody else, which he denied multiple times to me and to Officer Skunda. We did it separately. I even tried to get him to go to the hospital. I said, "I'll drive you right now. Let's go." He wanted to go home. He was adamant about it, and there was nothing I could have done. I didn't have enough to force him just for that statement that he made. There was no other acts or anything. He didn't have any marks on him, no bruises. He was a big guy, but he was calm. Whenever we asked him, there was no -- so I took him home.

*See* Exhibit "A", pp. 63-64.

49. Officer Skunda testified as follows:

Q. It says here that "Officer Kier and this officer" -- meaning you.

A. …

Q. -- asked Menas on separate occasions if he wanted to harm himself, to which he stated he did not want to harm himself to both officers.

A. Correct.

Q. if that your recollection?

A. Officer Kier spoke to him to see if he truly wanted to harm himself, harm others? He said no. I then spoke to him to see if he would tell me the same thing or if he would say anything different, to which he said he didn't want to harm himself. He just wanted to go home. Officer Kier also asked him if he would be willing to go to a hospital on a voluntary, if he just wanted to talk to somebody. He said no.

Q. And he did all of that while you were in the process of handcuffing him?

A. Yes.

*See* Exhibit "B", p. 48.

50. Officer Kier explained why he did not believe that they had sufficient evidence to involuntarily commit Dimitrios Menas:

Q. Did you suggest to Officer Kier that you should maybe have a medical evaluation done, given the fact that he made a remark about being dead?

A. No, because at that time it didn't seem like there was enough probable cause to arrest him involuntarily.

Q. What other factors would you be looking to, besides that one remark about being dead that you heard, what other --

A. I mean, it would have to be a multi totality of the circumstances. I mean, if he would have said that several times, if he would have, you know, tried -- if he would have been falling down, like, trying to hurt himself actively, I mean, it's -- it's -- there has to be more evidence. Just like – just like if a criminal, I mean, there has to be probable cause to arrest somebody. It's the same way, you know, a mental -- an involuntary 302 because you are arresting somebody against their will.

*See* Exhibit "B", p. 49.

51. Officer Kier explained his understanding of what is required to involuntarily commit somebody as follows:

Q. Did you receive any training involving how to deal with people who are in your custody and they are threatening to harm themselves?

A. Yes.

…

A. If somebody is suicidal and if there is enough probable cause, then yes, I would have to 302 them and take them to the hospital.

Q. When you say if someone is threatening themselves and there is a probable cause, what do you mean by "probable cause"?

A. Well, there needs to be probable cause to 302 somebody. You can't just - - if somebody says a statement and they don't mean it or if they say something with no acts, you know, with the Mental Health Procedures Act, you have to be precise, because you can't break someone's civil rights. So you have to make sure they mean what they are saying, and follow up if they had any acts or if they are actually trying to harm themselves. You know, if there are any marks or bruises or anything, then that will suffice to take them, or if there was more than just a statement made.

*See* Exhibit "A", pp. 10-11.

52. Officer Kier explained the training that he had that provided the knowledge

Q. If a statement is made, what do you do with that statement in terms of determining whether or not there is probable cause?

A. Ask them what they mean by the statement.

Q. Alright. Have you been trained as far as any kind of mental health evaluation of people?

A. Yes.

Q. What training have you received.

A. Crisis intervention training.

*See* Exhibit "A", p. 12.

53. Officer Kier provided more detailed testimony with regard to Mr. Menas' demeanor when the officers were questioning him:

Q. Was he moaning that night, right?

A. Oh, I thought you were there. No. He was not moaning. It was more he was just like, like, off and on crying. He was calm when we asked him these questions, and then he -- when he answered them, he answered them straight. He was -- he wanted to go home. He was not suicidal, and he did not want to hurt himself; and most of the time, he was mad about the party, about having his car towed and …

Q. And about being arrested?

A. Yeah, being arrested was one of them; but mostly, the party and then them taking his gun and keys and his phone. That is what he was mad about.

Q. Were there times when you could hear him, and he was just not making any sense?

A. Yes.

Q. So when he told you or refused to go to the hospital, did you take that into account that he was intoxicated and he was not making sense?

A. Partially; that is why we asked him multiple times, and he said no to every one of them.

*See* Exhibit "A", pp. 100-101.

**TRANSPORT HOME**

54. Dimitrios Menas slept on the ride home from the Police Station to his residence.

Q. After you got Dimitrios in the car and before you began to transport him to his residence, did you try to contact Maria Menas to let her know that her son had made a threat that he was going to himself or something along those lines?

A. No, I did not.

Q. Once he was in the cruiser, you said he fell asleep at some point; is that correct?

A. Yes, sir.

Q. Alright. Do you know if he was sleeping the entire time that you were on the way back?

A. From what I could tell when I was driving and what I could see in the camera.

Q. If he was making any comments while he was back there, you couldn't hear them; is that correct?

A. Like I said, I believe he was sleeping on the way home. I didn't hear anything back there until we got to his residence.

Q. Did you wake him up at all in order to get some understanding as to where he lived?

A. Yes.

Q. Tell us about that.

A. It was when we got on his road, and I was trying to figure out where his house was.

Q. Alright. And he was able to direct you to the house; is that correct?

A. Yes. I believe so.

*See* Exhibit "A", pp. 80-82.

55. On arrival, Officer Kier spoke with Mrs. Menas. *See* Exhibit "A", p. 82.

56. Mrs. Menas was waiting on the back porch for their arrival. *See* Exhibit "A", p. 82.

57. Officer Kier described their conversation as follows: "I told her, basically, about the party and what he said was missing. And I explained to her that he made a comment that he wished he was dead, something like that, that he wished to harm himself, and then he refused to go to the hospital." *See* Exhibit "A", pp. 82-83.

58. Mrs. Menas testified as to her collection of the conversation:

A. … when he came, I was outside. I waited. Officer Kier came. He said, "I'm so sorry that we're later than usual because I lost my way. I didn't know where I was. I lost my

way. I had to wake Dimitrios up to find my way her." He did say that is why they were later than what it was supposed to be, so I don't know the time. Sorry.

Q. No problem. So when Officer Kier and Dimitrios arrived at your residence, was Dimitrios in the back of the Police car?

A. Yes.

Q. Was he handcuffed?

A. Yes.

Q. Did Officer Kier speak to you before he got Dimitrios out of the car.

A. Yes.

Q. Can you tell me where that conversation took place?

A. I was on the porch, I got off porch. So we were near my porch and we were both standing. I had my cane. And Officer Kier told me that they slapped Dimitrios with a DUI. And he told me that Dimitrios was talking about being at a party, about taking some of these possessions. He said, well -- he said, "by the way, here is the paper. I wrote down where his car is impounded. It's at Clyde's."

…

A. And he said, "so he has to go file a report for" – when he wakes up, he said, after he sleeps this off, he said, to call the Police Station and we can file the report of all of his things that he was missing at the party."

*See* Exhibit "C", pp. 60-61.

59. While Officer Kier and Ms. Menas were talking, Dimitrios began to hit his head off the plexiglass in the rear of the Police car.

So then Dimitrios, he hit his head in the cruiser. And he was sleeping. So he said, "he just woke up." So he said, "let me get him out of there." So he walked there and he uncuffed Dimitrios. He was a big man, so it was tight back there. He took him out. He took his handcuffs off and them two were talking over there. I didn't go – when he was talking to Dimitrios, I just stayed. I just walked a couple of steps up. I didn't -- they were talking about something.

> And finally, I was out -- I did hear this. I don't know what -- I know Officer Kier said that -- what Dimitrios said to him, I don't know. He said -- I know Officer Kier said, "no woman is worth that." I don't know what that meant.

*See* Exhibit "C", pp. 61-62.

60. Officer Kier provided final instructions to Dimitrios Menas before leaving as testified to by Mrs. Menas as follows:

> A. He said, "no woman is worth that." So then I walked to Dimitrios and Officer Kier. And he was telling Dimitrios, "ok, I want you to go inside the house, go sleep this off. And you wake up, just, like I told you, come to the Station. We will drop you DUI." He said, "all I want you to do, we want you to give us the names of the people at the party, and, you know, whatever they took off of like you said, the pistol or whatever, the gun, your shoes and your cellphone." So Dimitrios said, "I am not going to be a narc," like I guess that means a snitch, I guess. So and Kier said, "when you wake up, you sleep this off," and he repeated again, he said, "we want you to give us all the names of those people at the party." And Dimitrios said, "I am not going to be a narc." I guess maybe I am butchering up that word.

*See* Exhibit "C", p. 62.

61. During the conversation, Dimitrios tried to convince Officer Kier to take him to the party.

> … so Dimitrios right before that he says to him, "you know, I know who has phone." He said, can you please take me there? I will tell you how to get there. I need my phone. I know who has it." Officer Kier said, "no, Dimitrios. I am not taking you anywhere." And he says, "go and sleep this off like I told you." He said, "but when I leave and I happen to get a phone call that you went up there and I come there and you are there, I am going to arrest you." So Dimitrios said, "But I know where my phone is. I need my phone." He said, "I told you, if I find you there, I am going to arrest you." So he no. Right before, you know, Officer Kier was ready to leave, he handed Dimitrios the keys for his car and all of the keys that were on there."

*See* Exhibit "C", p. 63.

62. Mrs. Menus was not in any way alarmed by the conversation between Officer Kier and her son,

> Q. Were you alarmed at what was being discussed between the two of them at all in terms of the officer's tone or attitude or anything like that?
>
> A. No. He had the same tone. And Dimitrios did the same thing. I mean, they were not raising their voices at each other. He just told Dimitrios not to go there.
>
> Q. Was Officer Kier being respectful of you and Dimitrios?
>
> A. Yeah, I'm not going to say – yeah, he was.

63. Officer Kier also testified about Dimitrios striking his head as he was talking to Mrs. Menas.

> A. She was pretty calm when I talked to her.
>
> Q. Did she say anything to you such as, "well, if he is threatening harm, shouldn't we get him off to the hospital?" Did she say anything like that you?
>
> A. There wasn't much more after that that was said, because then he -- then I heard him hitting the cage in the car. So then right after I got done talking to her, I walked over to the car, because I heard him hitting in the cage. I could hear him hitting it. I opened the door and he said his head had an itch. So after that is when our conversation ended; and then she walked over as I was talking to him, and that is when I got him out of the car.

*See* Exhibit "A", pp. 89-90.

64. Officer Kier then returned the keys to Mr. Menas. When questioned as to why he did so he responded "that is something I always do, so they can get in their house, you know, or if they need to -- you know, it's the keys to the residence." *See* Exhibit "A", p. 91.

**SUICIDE**

65. After Officer Kier left, Mrs. Menas and Dimitrios walked into the house. As they walked he described being at the party and what occurred. *See* Exhibit "C", p. 67.

66. Mr. Menas tried to get his mother to take him to the party and she refused. *See* Exhibit "C", pp. 67-68.

67. Mrs. Menas described the reaction of her son when she refused to take him to the party

> A. so Dimitrios got upset, of course, because I told him no. So then he walked fast to his room. And then I got up and I started walking after him, but I didn't walk -- I couldn't walk as fast as him. I heard lock the door. And then he moved -- I guess, I heard him move like a TV stand, I know it was the TV stand, he put it behind there.
>
> Q. He put his TV stand behind the door?
>
> A. Yeah, I could hear. It's a little TV stand the TV stood on there.
>
> Q. Any idea why he did that?
>
> A. He locked the door. You want me to tell you everything else? I don't know what happened. I can hear.

*See* Exhibit "C", pp. 68-69.

68. Mrs. Menas then heard her son unlock his gun safe and heard him grab a gun and bullets and trying to load the bullets "and then I could hear all of everything he was doing." *See* Exhibit "C", p. 69.

69. Mrs. Menas described crying and screaming and in response her son unloading the gun. *See* Exhibit "C", p. 69.

70. Mrs. Menas then called 9-1-1 and related to the dispatcher "I need help because my son is going to kill himself." *See* Exhibit "C", p. 70.

71. Mrs. Menas testified that she called a second time and the dispatcher advised that she was sending a police officer. *See* Exhibit "C", p. 71.

72. She described the second telephone as follows:

> So I called again the second time. I told her the same thing, that my son is still doing the same thing. And if he spoke up, it was the first he didn't speak to me, but he spoke to the lady. He didn't open the door. Through the door. And he said, "everything is fine." He goes, "I am just going to bed. Everything is fine. We don't need you." He said "I'll have to get up in a couple of hours to go to work." So he said, "everything is fine. Don't worry about it."
>
> …
>
> "So hang up the phone," he said. The lady said, "well, I tried to believe that is what you're saying. I don't want to make him more worked up." You know what mean, that is what he is telling her. So I hung up the phone.

*See* Exhibit "C", pp. 71-72.

73. Mrs. Menas then called a third time "so I called a third time. When I called, I told them, I told them 'I need somebody.'" She said, "isn't he there?" I don't know if it was same lady. I don't know. She said, "nobody is there yet?" I said, "no, nobody is here." *See* Exhibit "C", p. 72.

74. Mrs. Menas then went to check on her niece who was in her bedroom and as soon as she went to the other bedroom "and as soon as I went there, I heard the gun shot. He killed himself." And the lady says, "hello, what is going on there?" I said, "it's too late. My son is dead." *See* Exhibit "C", p. 73.

75. At the time that Dimitrios was dropped off by Officer Kier, Mrs. Menas did not believe that her son would harm himself.

> Q. So after the officer left, did you think that your son might hurt himself --
>
> A. No.

> Q. -- before he went to his room?
>
> A. No. My son was not like that.

*See* Exhibit "C", pp. 76-77.

76. Mrs. Menas denied ever cancelling the Police.

> Q. On any -- well, on either the first time or the second time, did you tell them that you did not need Police to respond?
>
> A. No. I told them I needed the Police because my son is going to kill himself.

*See* Exhibit "C", p. 77.

77. The Allegheny County Police Homicide Unit was requested to conduct an investigation. According to the Investigative Report only two phone calls were made as follows:

> At approximately 2:59 a.m., Allegheny County 9-1-1 received a 9-1-1 call from 512 Beech Street from a female reporting that her son may have shot himself. The woman, the victim's mother, appeared to be very animated on the phone call and hard to understand. During the phone call, you can hear a male's voice in the background. The woman then states that everything is ok and that no one is needed. Police are not dispatched after this 9-1-1 call is made. After the first 9-1-1 call was placed, the victim's mother heard the victim in his bedroom "racking" a firearm. Shortly later, the victim's mother hears a single gunshot from inside the victim's bedroom. At approximately 3:32 a.m., another 9-1-1 call was made from 521 Beech Street from the victim's mother stating that her son shot himself.

*See* Exhibit "Q", p. 2 of the Event Report.

78. In questioning Mrs. Menas more closely with regard to statements that her son made, she testified that during the second phone call to 9-1-1 the following was stated:

> "Everything is fine." He goes, "everything is fine." He says, "I have to go to sleep because I have to go to work in a couple of hours." He said, "everything fine." And then he told me to hang up the phone afterwards because he said "everything is fine."

*See* Exhibit "C", pp. 77-78.

79. Mrs. Menas denied the reported information in the County Homicide Report that she cancelled the Police from responding to her residence.

> Q. But you never said that to the dispatcher.
>
> A. No. No. My son took over. He was talking to the dispatcher.
>
> Q. Did he come out of his room to talk to them?
>
> A. No, through the door.

*See* Exhibit "C", pp. 78-79.

80. Again, Mrs. Menas related her son's instructions.

> A. The only thing he said to me was, "hang up the phone. Everything is fine." Because he told that lady he was going to bed because he had to get up in a couple of hours to go to work. Everything is fine. And then they told me to just hang up the phone, and that is when I hung up the phone and I went to Sophia. It was quiet for a -- but that was it."

*See* Exhibit "C", p. 81.

**FOLLOW UP INVESTIGATION**

81. The Plum Police learned from Mrs. Menas that her son had been brought home by a police officer and they determined that it was a Washington Township Police officer that had done so. *See* Exhibit "P", p. 2.

82. Sergeant Dimaria and Officer Kingerski contacted Officer Kier who confirmed that he arrested Dimitrios Menas and that he transported him to 521 Beech Road. *See* Exhibit "P", p. 2.

83. Officer Kingerski reported "Menas made several statements that "he wished he were dead" and was then dropped off to his mother at approximately 0210 hours. Kier was asked directly if he notified Maria Menas of her son's statements before leaving and he said that he was uncertain if he had notified her." *See* Exhibit "P", p. 2.

84. Sergeant Dimaria testified that Officer Kingerski learned that Dimitrios had been brought home by the Police. *See* Exhibit "D", p. 12.

85. Sergeant Dimaria explained that the reason he contacted the Washington Township Police officers was simply to confirm information that Dimitrios had been dropped off as follows:

> Q. When you were trying to reach the police officer who had delivered Dimitrios Menas to the residence, what was your reason for wanting to do that?
>
> A. That was the allegation that was being made, that he had been brought there by Police, I was trying to confirm that, so that we could figure out what exactly had occurred leading up to the incident and then verify that, just as part of our investigation.

*See* Exhibit "D", p. 14.

86. Sergeant Dimaria explained how Dimitrios' statement came to his attention.

> Q. How was it that the subject of Dimitrios threating to harm himself or wishing he was dead, how did that come up?
>
> A. I believe, from what I recall, that I asked if they encountered that male, just what the circumstances were. And I explained to him why I was asking, that the County Police were there, the incident we had had, and just -- he was forthcoming with the information, you know, that he had made statements. And I confirmed that. I said, so he made a statement that something that he wished he'd died? And I said, "that was it?" And he said "yes." They dropped him off, and then, you know, that was the end of it.

*See* Exhibit "C", p. 15.

87. Sergeant Dimaria did not ask any follow up questions about the police officer response to Dimitrios' statements.

> Q. … so Menas made these statements supposedly. Did the officers tell you how they responded to those statements? What they said to him, or did, or anything in response?
>
> A. No, sir.

…

Q. Did you ask them?

A. I don't believe so.

*See* Exhibit "D", p. 20.

88. Sergeant Dimaria made it clear that he took no position as to what, if anything, Washington Township Police should have done as follows:

Q. … based simply upon this statement, without knowing any other information about what the police officers -- how they responded, what they talked to him about, and how he responded after that, do you have enough information, as you sit here, to know whether they should have committed him or not?

A. I had no personal interaction dealing with him. So I can't gauge that, based on the information I have.

Q. … and, again, you asked this information of the Washington Township officers, just so you could provide background information to Renko and the Homicide detective, correct?

A. Yes, sir.

*See* Exhibit "D", p. 21.

Respectfully submitted,

**MARSHALL DENNEHEY**

BY: *s/ Paul D. Krepps*

PAUL D. KREPPS, ESQUIRE
PA ID #73038
NATHAN D. MARINKOVICH, ESQUIRE
PA ID #317125
**Counsel for Defendants**
501 Grant Street, Suite 700
Pittsburgh, PA 15219
pdkrepps@mdwcg.com
ndmarinkovich@mdwcg.com
(412) 803-1149
(412) 803-1188 Fax