IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | |
|---|---|
| MARIA MENAS, ADMINISTRATOR OF THE ESTATE OF DEMETRIOS EMMANUEL MENAS, DECEASED AND IN HER OWN RIGHT; <br><br> Plaintiff, <br><br> vs. <br><br> WASHINGTON TOWNSHIP, JARRED KIER, AND; AND JAKE SKUNDA, <br><br> Defendants, | 2:23-CV-00353-MJH |

OPINION

This case had been referred to United States Magistrate Judge Maureen P. Kelly for pretrial proceedings in accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Rule 72 of the Local Rules for Magistrate Judges.

On January 31, 2025, Magistrate Judge Kelly issued a Report and Recommendation (ECF No. 47), recommending that Defendants, Washington Township, Jarred Kier, and Jake Skunda's, Motion for Summary Judgment (ECF No. 28) be granted in part and denied in part. Judge Kelly recommended judgment in favor of Washington Township all on counts, and in favor of Officers Kier and Skunda on Count I-State Created Danger and Count V-Intentional Infliction of Emotional Distress. The parties were informed that written objections to the Report and Recommendation were due by February 14, 2025. (ECF No. 47). Defendants, Officers Kier and Skunda, filed timely written objections, and Plaintiff filed a response to said objections. (ECF Nos. 50 and 51). Following de novo review, Judge Kelly's Report and Recommendation will be adopted in part and rejected in part, and Defendants' Motion for Summary Judgment will be granted.

I.     Relevant Background

The Court adopts the following concise background provided by Judge Kelly's Report and Recommendation:

Plaintiff, Maria Menas, brings this civil rights action pursuant to 42 U.S.C § 1983 in her own right and as Administratrix of the Estate of her adult son Demetrios Emmanuel Menas. She asserts Fourteenth Amendment, *Monell*, and state law claims against Defendants for their alleged failure to provide treatment for Mr. Menas's obvious mental distress while in their custody and for their failure to prevent his death by suicide after his release. (ECF No. 1).

For purposes of the pending Motion for Summary Judgment, the parties stipulated to the following facts, as set forth in their Joint Statement of Undisputed Facts (ECF No. 26):

On July 5, 2021, Police Officers Kier and Skunda were on duty, in uniform, and driving marked police cars for the Washington Township Police Department. At 12:56 a.m., Officer Kier observed a black Mercedes Benz driving on Route 66 in Washington Township. Officer Kier noticed that the car was weaving outside the lanes of travel in a manner indicating that the driver may be driving under the influence. Officer Kier initiated his emergency lights and conducted a traffic stop.  Officer Kier spoke with Mr. Menas, the driver of the vehicle, and smelled a strong odor of intoxicating beverages and observed that the driver's speech was slurred. Mr. Menas exited the vehicle as requested and performed field sobriety tests, which he did not pass.

Based upon the evidence of Mr. Menas's intoxication, Officer Kier arrested Mr. Menas for driving under the influence. During the traffic stop, Officer Skunda arrived as backup at 1:04 a.m. Mr. Menas told the officers that he had been at a party in Saltsburg where he was forced to drink alcohol and was threatened by individuals who then forced him to leave and took his gun, shoes, and cellphone. Officer Kier transported Mr. Menas to the police department for blood

alcohol testing. Officer Skunda remained at the scene of the traffic stop until Mr. Menas's vehicle was towed, and then he proceeded to the police station, arriving at 1:35 a.m. While being transported to the Washington Township police station by Officer Kier, Mr. Menas was crying and hysterical. At the police station Mr. Menas's blood was drawn by EMS personnel.

Officer Kier contacted Mrs. Menas and spoke to her about transporting her son home. Officer Kier drove Mr. Menas home. Mr. Menas was upset about being arrested. As Officers Kier and Skunda were escorting Mr. Menas to the police car to transport him home, Mr. Menas uttered a comment that he wished that he was dead. Both officers heard the comment and separately asked Mr. Menas if he needed help, if he wanted to go the hospital, and if he intended to harm himself. Mr. Menas stated that he did not want help, did not want taken to the hospital, and denied that he intended to harm himself. Officer Kier transported Mr. Menas from the Washington Township Police Department to his home in Plum Borough.

During the transport, Mr. Menas slept until Officer Kier woke him just before arriving at his residence to find out about the exact location of his residence. Officer Kier arrived at Mr. Menas's home at 2:40 a.m. and spoke with his mother while Mr. Menas remained restrained in the police vehicle. During the conversation, Mr. Menas began to strike his head on the plexiglass in the rear of the police car. When Officer Kier opened the car door, Mr. Menas explained that his head was itchy. Kier released Mr. Menas from custody and cleared the call.

At 3:32 a.m., the Plum Police were dispatched to a 911 call of a burglary home invasion at the Menas home. At 3:35 a.m., Mrs. Menas advised Allegheny County 911 that she heard a gunshot coming from her son's bedroom. At 3:37 a.m., the Plum Police arrived on the scene. At 3:40 a.m., Plum Police confirmed for 911 dispatch that there was a male with a gunshot wound to his head. At 4:05 a.m., Allegheny County Police Department Homicide were notified and

responded to investigate. County investigating officers determined that Mr. Menas died from a self-inflicted gunshot wound.

Ms. Menas brought claims for the violation of Mr. Menas's Fourteenth Amendment rights against Officers Kier and Skunda for failing to request medical intervention or acquire medical assistance for Mr. Menas while in custody, and for state created danger to the risk of suicide upon his release (Count I), state law claims for intentional infliction of emotional distress (Count V), and claims for survival and wrongful death (Counts III and IV). *Id*. at 8-10, 19-20). She also brought a Fourteenth Amendment claim and state law wrongful death and survival claims against Washington Township for the alleged failure to adopt policies and procedures for handling individuals who have displayed vulnerability to suicide, and for failing to employ or provide appropriate training for police officers. *Id*. at 11-20 (Counts II through V).

II.   Discussion

**A.   Report and Recommendation**

In her Report and Recommendation, Judge Kelly recommended that Washington Township's Motion for Summary Judgment be granted on all claims (Counts II though V). Judge Kelly further recommended that the Court grant summary judgment in favor of Officers Skunda and Kier as to Mrs. Menas's Fourteenth Amendment state-created danger claim (Count I) and her claim for intentional infliction of emotional distress (Count V). As to Ms. Menas's Fourteenth Amendment claim for deliberate indifference to Mr. Menas's serious medical condition by failing to provide medical care (Count I), and her claims for wrongful death and survival (Counts III and IV), Judge Kelly recommended denial of Defendants' motion for summary judgment.

As regards the Fourteenth Amendment–failure to provide medical care (Count I), Magistrate Judge Kelly recommended that summary judgment be denied on said claim, because she found a question, which she characterized a "close question," of material facts as to said issue. *Id*. at p. 11. She also noted that, while the Mental Health Procedures Act (MHPA) may support Officers Kier and Skunda's "contention they did not act with deliberate indifference to a serious medical need," it [does] not provide an independent basis for summary judgment in their favor." (ECF No. 47 at p. 8).

### B. Objections to Report and Recommendation and Analysis

#### 1. Count I-State Created Danger, Count II-*Monell*, and Count V-Intentional Infliction of Emotional Distress

Mrs. Menas did not file objections to Magistrate Judge Kelly's Report and Recommendation, which recommended summary judgment in favor of Washington Township on the *Monell* claim (Count II) and in favor of all defendants on the State Created Danger claim (Count I) and the Intentional Infliction of Emotional Distress claim (Count V).

"[T]he failure of a party to object to a magistrate's legal conclusions may result in the loss of the right to de novo review in the district court." *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987). As a matter of good practice, however, the Third Circuit expects courts to "afford some level of review to dispositive legal issues raised by the report." *Id*. at 878.

Accordingly, after *de novo* review of the pleadings, documents and deposition evidence, the Magistrate Judge's January 31, 2025 Report and Recommendation (ECF No. 47), as regards Count I, Count II, and Count V, will be adopted as the Opinion of the Court. The Defendants' Motion for Summary Judgment (ECF No. 28), Count I-State Created Danger, Count II-*Monell* claims against Washington Township, and Count V-Intentional Infliction of Emotional Distress, will be granted.

### 2. Count I-Deliberate Indifference for Failure to Provide Medical Care

In their Objections, Officers Kier and Skunda contend that there is insufficient evidence to support that they were deliberately indifferent to Mr. Menas's alleged serious medical needs while in custody, or to support that they knew or should have known of Mr. Menas's alleged particular vulnerability to suicide. In addition, Officers Kier and Skunda maintain that liability is precluded, because Mr. Menas was no longer in custody at the time of his suicide. Finally, Officers Kier and Skunda argue that the Report and Recommendation erred by not applying the Mental Health Procedures Act (50 P.S. § 7101, *et seq*) (MHPA) as an appropriate yardstick for determining the Defendants' authority and, by extension, duty to address Mr. Menas's alleged suicidal vulnerability.

In response, Mrs. Menas argues that the Magistrate Judge appropriately decided the issue of failure to provide medical care, based upon officers' obligations under the Fourteenth Amendment, and that the MHPA does not direct the decision herein. Mrs. Menas further maintains that the Magistrate Judge correctly concluded that there are genuine issues of fact, precluding entry of summary judgment in favor of Officers Kier and Skunda for failing to provide medical care to Mr. Menas in the circumstances of his alleged serious mental distress while he was in police custody.

To state a Fourteenth Amendment claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and engaged in conduct that violated a right protected by the Constitution or laws of the United States. *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013) (citing *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)). There is no question that the officers were acting under color of state law. As to the second element, Mrs. Menas alleges that Officers Kier and Skunda violated Mr. Menas's Constitutional

rights pursuant to the Fourteenth Amendment, by failing to provide medical treatment while he was under arrest.

As regards a Fourteenth Amendment claim for failure to provide medical care, pretrial detainees may assert a Section 1983 claim for inadequate medical care under the Fourteenth Amendment as a violation of their right to due process. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003); *Colburn v. Upper Darby Township*, 838 F.2d 663, 668 (3d Cir. 1988) ("*Colburn I*"). In the Third Circuit, the protections afforded to pretrial detainees under the Fourteenth Amendment are "at least as great as" those guaranteed to convicted prisoners under the Eighth Amendment. *See Natale*, 318 F.3d at 581 (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Generally, to succeed on a violation of the right to medical care under a Fourteenth Amendment standard, an individual must demonstrate (1) "a serious medical need" and (2) "acts or omissions by [individuals] that indicate a deliberate indifference to that need." *Thomas v. City of Harrisburg*, 88 F.4th 275, 283 (3d Cir. 2023). Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury or "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990); see also *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993).

In addition to the above criteria for providing medical care in general, in the context of suicide, the Fourteenth Amendment requires a more refined and heightened standard before a

7

right and corresponding duty to provide medical care arises. In circumstances of suicide, to prove liability under the Fourteenth Amendment for failure to provide medical care, a plaintiff must also demonstrate: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Palakovic v. Wetzel*, 854 F.3d 209, 218 (3d Cir. 2017).

The requirement of a "particular vulnerability to suicide" speaks to the degree of risk inherent in the detainee's condition. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). The requirement of "reckless or deliberate indifference" implies that there must be "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.* (citations omitted). Even where a strong likelihood of suicide exists, it must be shown that the custodial officials "knew or should have known" of that strong likelihood. *Id*. It is not necessary that the custodian have a subjective appreciation of the detainee's "particular vulnerability." *Id*. at 1024-25. Nevertheless, there can be no reckless or deliberate indifference to that risk, unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide. *Id*.

The phrase, "should have known," is term of art with a meaning distinct from its usual meaning in the context of the law of torts. *Id*. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. *Id*. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. *Id*. The "strong likelihood" of suicide

8

must be "so obvious that a lay person would easily recognize the necessity for" preventative action, the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges. *Id*.

In contrast to pre-trial detainee's Fourteenth Amendment rights under general and suicidal circumstances, there is no constitutional right or duty to provide medical treatment for serious medical needs where there is no custodial relationship. As a general matter, the government has no affirmative duty to protect its citizens from private harms. *Ye v. United States*, 484 F.3d 634, 636 (3rd Cir.2007) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). While the Due Process Clause protects against potential abuses of government power to deprive citizens of life, liberty, or property, "[t]he Constitution protects people from the government, not from each other **or from themselves.**" *Ye*, 484 F.3d at 637 (emphasis added). In the custodial context, it is the general rule that certain rights apply when a person is "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994). Courts have further found that, in the context of post-custody harm by suicide or third parties, state actors are not liable.[1]

---

[1] *See Lewis v. County of San Bernardino*, 558 Fed. Appx. 735, 737 (9th Cir. Feb. 24, 2014) (finding the government owed no duty to protect detainee from suicide 12 hours after release); *Coscia v. Town of Pembroke, Mass.*, 659 F.3d 37, 39 (1st Cir. 2011) (finding police officers owed no duty to protect detainee from suicide 14 hours after release); *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010) (concluding that the law did not clearly establish state actors could be liable for private harm to an individual after his release from custody); *Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998) (plaintiffs cannot base their claims on the assertion that Dr. Downing or Milwaukee County had an obligation to stop Jonathan from committing suicide once he had been released from the jail); *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1261 (10th Cir. 1998) (holding school did not owe a duty to protect a student from committing suicide at home); *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 570 (11th Cir.

Finally, the MHPA is a law that confers authority to police officers to take a non-willing person for involuntary emergency examination is governed by the MHPA. Under the MHPA, a person qualifies for involuntary hospitalization only if that person is (1) severely mentally disabled and (2) in need of immediate treatment. 50 P.S. §7301(a). A person is considered severely mentally ill, when, as the result of mental illness, his capacity to exercise self-control, judgment, and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he or she is a clear and present danger to harm himself/herself or others. *Id*.

Further, in the context of self-harm, the "clear and present danger" standard can be established as follows:

> (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or
>
> (iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b)(2)(ii)-(iii).

The MHPA specifies clear criteria that must be met before a police officer can take a non-willing person to a facility for an involuntary emergency examination. If these criteria are met, the MHPA provides authority for an involuntary emergency examination and treatment. Under the MHPA, when, "[u]pon personal observation of the conduct of a person constituting

---

1997) (finding that, under the Due Process Clause, a school did not owe a duty to protect a student from committing suicide at home).

10

reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, an[y] … physician or peace officer, … may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination." 50 P.S. §7302(a)(2). Therefore, under the MHPA, an officer must declare his/her subjective belief that, from personally observed conduct, a person meets the criteria as being severely mentally disabled, severely mentally ill to a degree that such person is a clear and present danger to inflict harm upon himself/herself or others, and that such person is in need of immediate treatment. There must be objective facts and circumstances to support the officer's declaration in order to satisfy the "clear and present danger" requirements under the MHPA § 7301(b)(2)(ii)-(iii). Absent facts and circumstances to establish such authority to act, an officer cannot take a non-willing person to an authorized facility for an involuntary emergency exam.

In summary, Mr. Menas's Fourteenth Amendment right to be provided medical care during his detention, depended upon the risk presented by his custodial status and by his medical needs at that time. In general, to establish Fourteenth amendment liability, a plaintiff must establish 1) a serious medical need, and 2) acts or omissions that indicate deliberate indifference to that need. In that Mr. Menas's presenting medical issue was in relation to suicide, to find a serious medical need, Plaintiff must also establish 1) that Mr. Menas presented a particular vulnerability to suicide, meaning a strong likelihood that he would attempt suicide, and 2) the officers knew or should have known of such particular vulnerability, and 3) that the officers acted with reckless or deliberate indifference, meaning something beyond mere negligence to such vulnerability.

Analysis of the Fourteenth Amendment rights and duties at issue herein presents unique challenges in light of the limited timeline and extent of the interactions between the Officers and Mr. Menas during his arrest, DUI processing, transport home, and delivery into his mother's care before he committed suicide. Mr. Menas's continuum of custodial and non-custodial circumstances requires consideration of variable analytical frameworks. First, Mr. Menas was, for a time, in Officers' Kier and Skunda's custody. Thus, he was entitled to those Fourteenth Amendment protections as applied to pre-trial detainees. However, because Mr. Menas's situation involved a suicide, before the Plaintiff can prove Fourteenth Amendment liability, the Plaintiff must satisfy the added elements necessary to establish a right and corresponding duty for the Officers to provide medical care for suicide prevention. Second, the instant facts have the added wrinkle that Mr. Menas, was not in Defendants' custody at the time he committed suicide. Finally, given the unique and limited timing of the events surrounding Mr. Menas's DUI arrest and processing at the Washington Township police station and his transport to his home and delivery to his mother, the parties have argued concerning the applicability of the provisions of the MHPA and the impact of the MHPA upon the Officers' Fourteenth Amendment liability issue in this case.

    a. <u>Deliberate Indifference to Suicide Risk</u>

Given the legal principles presented above, for Mrs. Menas to establish liability under the Fourteenth Amendment–failure to provide medical care in the circumstance of suicide prevention, Mrs. Menas has the burden to produce facts to establish, in light of the degree of risk inherent in Mr. Menas's condition, that the Officers knew or should have known, that Mr. Menas had a particular vulnerability to suicide, a strong likelihood that he would attempt suicide, and that the Officers' failure to act was reckless or deliberately indifferent.

Here, the failure to provide medical care claim is limited to Mr. Menas's time in custody. While in the Officers' custody, the appropriate standard requires a finding of Mr. Menas's particular vulnerability to suicide and reckless or deliberate indifference in how Officers Kier and Skunda responded to his conduct. Mr. Menas's interactions with Officers Kier and Skunda began with a traffic stop at 12:56 a.m. (ECF No. 27 at ¶ 2). During the course of the traffic stop, including the field sobriety tests, Mr. Menas did not make any comments that he intended to harm himself. *Id*. at ¶ 37. After suspecting Mr. Menas of a DUI, Officer Kier requested that EMS meet them at the police station for a blood draw. *Id*. at ¶ 4. At 1:17 a.m., Officer Kier transported Mr. Menas to the police station. *Id*. at ¶ 5. During the transportation of Mr. Menas to the Township police station, Mr. Menas was crying and hysterical. (ECF No. 26 at ¶ 10). At 1:28 a.m., Officer Kier and Mr. Menas arrived at the Washington Township police station. (ECF No. 27 at ¶ 6). During his time at the police station, Mr. Menas was not placed in a holding cell. *Id*. at ¶ 40. While at the station, Officer Kier contacted Mrs. Menas, informed her that her son had been charged with a DUI, and requested that she come pick him up. *Id*. at ¶¶ 41, 42. After Mrs. Menas told Officer Kier that she could not drive to the station, Officer Kier offered to transport Mr. Menas to his residence. *Id*. As Officer Kier and Officer Skunda were escorting Mr. Menas to the police car to transport him home, Mr. Menas uttered a comment to the effect that he wished that he was dead. (ECF No. 26 at ¶ 17). Both officers heard the comment and separately asked Mr. Menas if he needed help, if he wanted to go the hospital and if he intended to harm himself. *Id*. at ¶ 18. Mr. Menas did not want help, did not want taken to the hospital, and denied that he intended to harm himself. *Id*.

At 2:08 a.m., Officer Kier left the Police Station to transport Mr. Menas to his mother's house in Plum Borough. (ECF No. 27 at ¶ 8). Mr. Menas slept in the police car during the

transport home. *Id*. at ¶ 54. At 2:40 a.m., Officer Kier arrived Mr. Menas's residence. *Id*. at ¶ 9. When they arrived at the house, Mrs. Menas was outside waiting on her porch for Officer Kier and Mr. Menas. *Id*. at ¶ 56. Mr. Menas began to strike his head on the plexiglass in the rear of the police car. *Id*. at ¶ 23. When Officer Kier opened the car door, Mr. Menas explained that he banged his head because his head was itchy. *Id*. Officer Kier spoke with Mrs. Menas upon arrival at their residence and released Mr. Menas to his mother and cleared the call. (ECF No. 26 at ¶ 22). As he left the scene, Mrs. Menas walked her son into the house. (ECF no. 27 at ¶ 65). Mr. Menas had no known psychiatric medical history or history of depression. *Id*. at ¶ 23, 25.

Here, Mr. Menas's words and conduct do not meet the Fourteenth Amendment standards to establish Fourteenth Amendment liability against the Officers. Mr. Menas made a past-tense comment that "he wished he was dead," which could or could not be interpreted as a threat of self-harm. However, the record does not support that Mr. Menas made any other comments, while in the presence of Officers Kier and/or Skunda, that suggested that he wanted or intended to commit suicide or to take steps in furtherance of committing suicide sufficient to demonstrate a strong likelihood of suicide. Moreover, when asked by Officers Kier and Skunda whether they should take his statement seriously, Mr. Menas denied that he actually wanted to die or to harm himself; further, he refused to be taken to a hospital or to voluntarily admit himself. In addition, no evidence of record supports that Mr. Menas engaged in any suicide planning process or conducted research into how to commit suicide, or expressed any detailed plan to do so. Although Officer Kier observed that Mr. Menas appeared to bang his head on the plexiglass of the police vehicle when at his home, when he asked Mr. Menas about that conduct, Mr. Menas explained that his head was "itchy." Nothing else from the record supports that Mr. Menas ever acted aggressively or in a threatening manner toward himself or others. Such evidence, even in

total, does not provide sufficient grounds to establish any question of material fact that the Officers should have concluded that Mr. Menas presented with a serious medical need sufficient to satisfy the elements necessary to establish liability under the Fourteenth Amendment in the context of suicide.

Further, the predominant activity to suggest concern for suicide arose with Mr. Menas's statement on the way to the car for his transport home, and then, when at his home, he banged his head in the police car. At that time, there was no indication of inherent risk for Mr. Menas to commit suicide during his custodial status. From the Officers' perspective, they had no factual history or any other patent reason from which would have known or should have known that Mr. Menas presented any particular vulnerability to suicide. They only knew what they had observed during their brief encounter with him. Therefore, they had no sufficient basis to appreciate any heightened risk of suicide during their time with him and before they delivered him home and to his mother. Mr. Menas had denied suicidal intent, denied a need for further care, and denied an offer to transported to the hospital. Furthermore, he gave a reasonable, non-self-harm and non-suicidal explanation for why he hit his head in the car.

Therefore, given the particularized standards under the Fourteenth Amendment to establish a right to medical care for a suicidal risk, the record does not create any question of material fact to establish that Officers Kier and Skunda knew or should have known that Mr. Menas had a particular vulnerability to suicide, that he presented a strong likelihood that he would attempt suicide, or that Officers acted with reckless or deliberate indifference to Mr. Menas's needs. The totality of the circumstances does not support any finding that the degree of risk inherent in Mr. Menas's condition or the presenting facts and circumstances support a finding that he had a vulnerability to suicide during his time in custody. Thus, there is no

question of material fact established by the record that the Fourteenth Amendment provides a basis of liability against the Defendants.

Accordingly, the Court rejects the Report and Recommendation as to Count I-failure to provide medical care, and grants Officers Kier and Skunda's Motion for Summary Judgment.

b.     Post-Custody Duty of Officers

In addition to assessing the Fourteenth Amendment standards to find a constitutional right and an officer's concurrent responsibility to provide medical care to the serious medical needs of a detainee in the context of suicide, the Court will also address the fact that Mr. Menas was not in Defendants' custody at the time he committed suicide.

Here, the harm suffered by Mr. Menas, his death by suicide, occurred after he was no longer in the Officers' custody.  In this context, after Officers Kier and Skunda completed processing Mr. Menas for his DUI arrest, they were transporting him home to his mother.  The parties do not dispute that Officers Kier released Mr. Menas to the care of his mother, at their Plum Borough home. At that point, after he exited the police vehicle, Mr. Menas was at home. His freedom of action was no longer impaired by the Officers.  Of further note, Mr. Menas's suicide did not occur until an hour after he was delivered to his mother's care.   Therefore, in these circumstances, there are no genuine issues of material fact that Mr. Menas was no longer in the custody of Officers Kier and Skunda when Mr. Menas committed suicide.  Thus, Officers Kier and Skunda owed Mr. Menas no affirmative duty under the Fourteenth Amendment for his subsequent suicide.

Accordingly, for this additional reason, there is no liability to Plaintiff under the Fourteenth Amendment Count I-failure to provide medical care.

c. MHPA

As regards the parties' arguments about the applicability of the MHPA, since this Court has concluded that the Plaintiff failed to produce sufficient evidence to establish Fourteenth Amendment liability under the standards for a detainee in the context of suicide, neither analysis nor application of the procedures and standards under the MHPA is necessary in this case.

3. **Count III-Wrongful Death and Count IV-Survival**

Neither the Wrongful Death nor Survival statute creates an independent cause of action; "rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent." *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 660 (Pa. Super. 2013) (citation omitted). In other words, without an underlying tort, there can be no wrongful-death or survival action. *Id*.

Because the Court will be granting summary judgment on all substantive claims, it will also grant summary judgment on the derivative claims in Count III and Count IV.

4. **Qualified Immunity**

Because the Court has determined that Officers Skunda and Kier are entitled to summary judgment as to all claims against them, we need not address their qualified immunity defense.

III. Conclusion

For the reasons stated above, the Court adopts in part and rejects in part the Report and Recommendation and grants summary judgment in favor of all defendants on all claims. A separate order will follow.

DATED this 31st day of March, 2025.

BY THE COURT:

MARILYN J. HORAN
United States District Judge